**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CENTER FOR FOOD SAFETY**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **KEN SALAZAR**, *et al.*, <br><br> **Defendants.** | Civil Action No. 11-1457 (JEB) |

**MEMORANDUM OPINION**

Three national nonprofit organizations – Beyond Pesticides, the Center for Food Safety, and Public Employees for Environmental Responsibility – bring this challenge under the Administrative Procedure Act to the United States Fish and Wildlife Service's decision to allow genetically modified corn and soybeans to be farmed on National Wildlife Refuge land in the Southeast Region (Region 4). Plaintiffs assert that Defendants violated the National Environmental Policy Act, the National Wildlife Refuge System Administrative Act of 1966, and the APA by failing to conduct appropriate environmental analyses prior to authorizing such farming.

Defendants have agreed that they will not permit such farming in 2013 until they have performed the required environmental studies. As a result, when Plaintiffs moved for Summary Judgment, Defendants moved to dismiss for lack of jurisdiction, arguing that the case was now moot. Because the Court determines that Plaintiffs' claim is not moot, it will deny Defendants' Motion and grant Plaintiffs'.

1

## I.    Background

### A.  Statutory and Regulatory Background

The National Wildlife Refuge System contains 553 national wildlife refuges and 38 wetland management districts throughout the country.  See FWS000001.  "The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."  See National Wildlife Refuge System Improvement Act of 1997 § 4, 16 U.S.C. § 668dd(a)(2) (the Refuge Act).  "Each refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." § 668dd(a)(3)(A).

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, requires federal agencies to consider the environmental impact of "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Projects that significantly affect the environment require the preparation of an Environmental Impact Statement (EIS).  See 42 U.S.C. § 4332(C).  Projects whose environmental impact is not clearly established require the preparation of an Environmental Assessment (EA), followed by either a finding of "no significant impact" on the environment (FONSI), or the subsequent preparation of an EIS.  See 23 C.F.R. § 771.115; 40 C.F.R. §§ 1508.9, 1508.13.

### B.  Factual and Procedural Background

The Southeast Region (Region 4) of the National Wildlife Refuge System covers over 430,000 square miles in ten states.  See Pl. Mot. at 2.  The Region includes 128 national wildlife refuges covering some 4 million acres of protected land.  See id.  In addition to serving as a

haven for 322 endangered species, see id. at 3, the Southeastern refuges have permitted some agricultural production since at least the 1930s. See id. Farming on refuge land is typically done pursuant to cooperative farming arrangements, whereby local farmers plant on designated areas in a refuge and harvest a share of the crop. See FWS000026. The Refuge Act requires the Fish and Wildlife Service, which oversees the National Wildlife Refuge System, to conduct a compatibility determination before allowing any use of refuge land, including for farming. 16 U.S.C. § 688dd(d)(1)(A). FWS has completed compatibility determinations approving farming in 25 Southeastern refuges, see FWS000179-302, but these compatibility determinations do not specifically address the use of genetically engineered crops. See Pl. Mot. at 4. FWS policy, moreover, prohibits the use of genetically engineered crops on refuge land unless there is "no feasible alternative" for accomplishing a refuge purpose. See FWS00007.

FWS has nonetheless allowed the planting of genetically engineered crops on some 44,000 acres of refuge land in the Southeast Region. See FWS000313. The most common genetically modified crops planted in Southeastern refuges are corn and soybeans that have been developed to be resistant to the broad application of the herbicide Roundup (glyophosphate), known as "Roundup Ready" crops. See FWS000013-14. Plaintiffs assert that the use of such genetically engineered herbicide-resistant crops has numerous adverse environmental impacts. See Pl. Mot. at 7-10.

In 2009, Plaintiffs petitioned Interior Secretary Ken Salazar to request a "moratorium on all [genetically engineered] crop cultivation in National Wildlife Refuges' until the agency complie[d] with NEPA and the Refuge Act." See Pl. Mot. at 12. Shortly thereafter, the Acting Director of FWS issued guidance stressing that refuge farming programs must comply with NEPA, the APA, and relevant FWS policies. See FWS000008. FWS subsequently prepared a

six-page Finding of No Significant Impact (FONSI) regarding farming genetically engineered crops on refuge land. Such FONSI merely adopted a series of 89 NEPA analyses conducted by the United States Department of Agriculture. See FWS000315. FWSI posted the FONSI for public comment at the Southeast refuges growing genetically engineered crops on November 21, 2010. Id. The final FONSI was signed thirty days later. Id.

Plaintiffs filed this lawsuit on August 11, 2011, on behalf of themselves and their members, alleging that Defendants' continued authorization of the cultivation of genetically modified crops on refuge land without conducting a Compatibility Determination violated the Refuge Act, see Compl., ¶¶ 41-44, and that Defendants' FONSI violated NEPA. See id., ¶¶ 45-52. They named as Defendants Ken Salazar, Secretary of the United States Department of the Interior; Daniel Ashe, Director of FWS; and FWS itself. The Court also permitted the Biotechnology Industry Association to submit a brief as *amicus curiae*. Plaintiffs have now moved for Summary Judgment; in response, Defendants have moved to dismiss for lack of jurisdiction, asserting that Plaintiffs' claims are moot.

**II.    Analysis**

On the merits of their APA claim, Plaintiffs assert that Defendants violated the Refuge Act, NEPA, and the APA by authorizing farming with genetically modified crops in Wildlife Refuges in the Southeast Region without first conducting a Compatibility Determination required by the Refuge Act or an adequate Environmental Assessment or Environmental Impact Statement required under NEPA. See Pl. Rep. and Opp. at 1-2. Defendants take no issue with any of these arguments. Instead, Defendants contend that because they have voluntarily decided to cease such authorization at the end of the 2012 growing season until "appropriate environmental analysis under NEPA and a Compatibility Determination" have been completed,

Plaintiffs' claims are moot. See Def. Mem. at 1-2. The only issue for the Court, therefore, is a consideration of the parties' mootness arguments. Because the controversy is ongoing and this Court has the power to grant effective relief, the Court ultimately finds Plaintiffs' claim is not moot. As Defendants have conceded the merits of Plaintiffs' claims, the Court will grant Plaintiffs' Motion for Summary Judgment and hold a hearing to discuss an appropriate remedy.

Under Article III, Section 2 of the Constitution, this Court's power "depends on the existence of a case or controversy." Preiser v. Newkirk, 422 U.S. 395, 401 (1975). Federal courts may not "give opinions upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992). "'Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 469 (1969)). A case may become moot if the defendant ceases its objectionable acts during the proceedings and "it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur . . . and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Id. (internal citations omitted; emphasis added). Both conditions must be satisfied for a case to be considered moot, and "the burden of demonstrating mootness 'is a heavy one.'" Id. (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953)). Indeed, a case is only moot if the court is unable to grant "any effectual relief whatever to the prevailing party." City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (internal citations and quotation marks omitted; emphasis added). Defendants have not met this heavy burden.

Although Defendants have indicated that they will no longer permit farming of genetically modified crops in Southeastern Refuges after the 2012 growing season, Plaintiff's case is not moot because this decision has not "completely and irrevocably eradicated the effects of the alleged violation." Davis, 440 U.S. at 631; see also United States v. Microsoft, 1998 WL 614485, at *20 n.21 (D.D.C. Sept. 14, 1998) ("[T]he Court retains jurisdiction to consider even the 'waived' practices if they caused anticompetitive effects.") (citing Northwest Environmental Defense Ctr. v. Gordon, 849 F.2d 1241, 1245 (9th Cir. 1988)). In other words, Plaintiffs allege harms that are currently occurring and will continue throughout 2012. Waiting for 2013 is not good enough.

More specifically, Plaintiffs cite a litany of ongoing environmental effects, including "harm [to] beneficial insects, increase[ed] prevalence of [herbicide] resistant weeds, alter[ed] soil ecology, and [genetic] contaminat[ion] [of] natural plants." See Pl. Mot. at 6; Compl., ¶ 32. Plaintiffs further assert that herbicide-resistant genetically modified crops may harm amphibians and birds that eat herbicide-tainted crops. See Compl., ¶ 34. Because Defendants here move for dismissal, the Court must take these factual allegations as true. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993)); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Defendants' assertion that FWS will cease permitting the farming of genetically modified crops after the current growing season does nothing to mitigate the alleged ongoing environmental effects of its decision to allow such planting. See also Fund for Animals v. Jones, 151 F. Supp. 2d 1, 7 (D.D.C. 2001) (holding Plaintiffs' claim not moot where agency withdrew objected-to authorization while litigation was

6

pending, because withdrawal of authorization "may have stopped the killing of the bison, [but the related, underlying program] continue[d] to affect the environment").

Likewise, Plaintiffs' case is not moot because the Court could still grant them some form of effective relief. See City of Erie, 529 U.S. at 287. For purposes of a mootness analysis, "any effective relief whatever" is expansively defined. See id. "While a court may not be able to return the parties to the *status quo ante*," a court's ability "to effectuate a partial remedy" is "sufficient to prevent [a] case from being moot." Church of Scientology, 506 U.S. at 12-13. Indeed, the availability of any form of relief will save a case from mootness, even if the party cannot "prove that 'the requested relief is certain to alleviate their injury.'" Public Citizen v. National Highway Traffic Safety Administration, 848 F.2d 256, 263 (D.C. Cir. 1988) (quoting International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 811 (D.C. Cir. 1983)) (emphasis in International Ladies' Garment Workers' Union). Effective relief "encompasses acts that may not necessarily undo a *fait accompli*, but that may serve to mitigate it." Citizens Alert Regarding the Environment v. Leavitt, 355 F. Supp. 2d 366, 369 (D.D.C. 2005). "Courts of equity have broad discretion in shaping remedies; . . . . [t]hus, in deciding a mootness issue, 'the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.'" Gordon, 849 F.2d at 1244-45 (quoting Garcia v. Lawn, 805 F.2d 1400, 1403 (9th Cir. 1986)).

Plaintiffs, for their part, claim that this Court could grant "a myriad of effective relief." See Pl. Opp. and Rep. at 2. Beyond remand to the agency and vacatur of Defendants' decision approving the planting of genetically engineered crops, Plaintiffs identify a list of "mitigation measures with respect to the already-planted crops" that the Court might order. Id. at 9. These measures include requiring farmers of genetically engineered crops to "survey, identify and

7

eliminate any bolters in their fields before they produce pollen or seed to prevent or minimize the potential of transgenic contamination to neighboring fields or wild relatives"; requiring "that no genetically engineered crops . . . be left in the field after harvest, in order to prevent bolting and transgenic contamination"; requiring Defendants to "survey the land surrounding refuge farmland and institute isolation distances where there is a possibility of gene flow to neighboring crops or wild relatives"; requiring Defendants to survey and disclose the locations of genetically modified crops currently growing in wildlife refuges; and requiring a ban on "all further spraying of pesticides on all genetically engineered crops on refuge lands in the Southeast." Id. at 9-10.

      Without passing on the wisdom of any of these proposed measures, the Court finds that Plaintiffs have demonstrated that it could grant some form of effective relief. Cases from this Circuit and our sister Circuits – even cases to which the Government has been a party, involving identical subject matter – have found that the availability of measures to mitigate the ongoing effects of unlawful agency action are sufficient to save a case from mootness. For example, in Lemon v. Geren, 514 F.3d 1312 (D.C. Cir. 2008), the D.C. Circuit held that plaintiff's claim challenging the transfer of a decommissioned Army base to a private entity after the transfer had been completed was not moot because "[i]f unraveling the transfer is necessary after the district court decides the merits, it will be within the court's power to do so." Id. at 1316.

      Other circuits have reached similar conclusions. In Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426 (10th Cir. 1996), the Tenth Circuit held that plaintiffs' NEPA claim regarding the construction of a new runway was not mooted by the completion of construction because the court "could order that the runway be closed or impose restrictions on its use." Id. at 429. In Gordon, plaintiffs challenged a fisheries management plan that led to the overharvesting of coho salmon during the 1986 fishing season. The district court held that the case was moot

because the fishing season was over, and "'no decree by the court granting injunctive or declaratory relief can undo the harvesting of coho salmon that took place during the 1986 season.'" Gordon, 849 F.2d at 1244. The Ninth Circuit reversed, holding that "the damage [could] still be repaired or mitigated – obviously not by restoring the fish harvested in 1986, but by allowing more fish to spawn in 1989." Id. at 1245; see also Pyramid Lake Paiute Tribe of Indians v. Hodel, 882 F.2d 364, 368 (9th Cir. 1989) (holding similar challenge to water management plan not moot where "harm [to fish population] [could] be remedied by storing . . . an equivalent amount of water . . . for possible use during future spawning seasons"). While these cases are not binding precedent here, the Court finds their reasoning instructive.

This case is not unique: it is one in a series of challenges to a variety of federal agency decisions authorizing or expanding the use of genetically modified crops. Plaintiffs and their peer organizations have brought NEPA challenges to the initial approval of several "Roundup Ready" crops and to the planting of those crops throughout the National Wildlife Refuge System. See, e.g., Center for Food Safety v. Salazar, --- F. Supp. 2d ---, No. 11-1934 (JEB), 2012 WL 4857793 (D.D.C. Oct. 15, 2012); Delaware Audubon Society, Inc. v. Secretary of the Interior, 612 F. Supp. 2d 442 (D. Del. 2009) (Prime Hook); Center for Food Safety v. Vilsack, 753 F. Supp. 2d 1051 (N.D. Cal. 2010) (Sugar Beets II); Geertson Farms, Inc. v. Johanns, No. 06-1075, 2007 WL 1302981 (N.D. Cal. May 3, 2007) (Alfalfa I). In both Alfalfa I and Sugar Beets II, the Northern District of California awarded plaintiffs relief similar to that requested here. In Sugar Beets II, the court entered an injunction requiring the removal of already-planted genetically modified crops. Sugar Beets II, 753 F. Supp. 2d at 1062. In the Alfalfa I litigation, the court required a variety of steps to "attempt to minimize the risk of gene flow from the already-planted genetically engineered alfalfa to organic and conventional alfalfa." Alfalfa I, 2007 WL 1302981,

at *9. These measures included a ban on the use of pollinators in fields planted with Roundup Ready Alfalfa, specified cleaning procedures for farm equipment used in Roundup Ready Alfalfa production, specified handling requirements for the Roundup Ready Alfalfa harvested at the end of the season, and public disclosure of the locations of fields containing the Roundup Ready crops. Id.

This Court is not bound by these decisions, nor does the Court take any position on any of the forms of relief at issue in them. Rather, these cases are useful only in that they show that these forms of relief were available on similar facts. The bar for Plaintiffs here is not high: to demonstrate a "live controversy," they need only show that some form of effective relief could be available to them should they prevail – however partial the remedy, however uncertain its potential to truly address Plaintiffs' concerns. See City of Erie, 529 U.S. at 287; Church of Scientology, 506 U.S. at 13; Public Citizen, 848 F.2d at 263. The extensive record of courts granting – or even considering – relief similar to that requested by Plaintiffs here suggests that it is squarely within this Court's power to grant Plaintiffs some form of effective relief. As a result, Plaintiffs' case is not moot.

The Court believes a decision now on what specific relief to order would be uninformed and premature. The Court, accordingly, will hold a hearing to discuss the parties' positions on various forms of relief. In the interim, the Court urges the parties to meet and confer to determine if they can reach agreement on at least some potential remedies.

### III. Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Motion to Dismiss, and set the case for a hearing on November 5, 2012, to

determine an appropriate remedy.  A separate Order consistent with the Opinion will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 23, 2012